# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

| | | |
|---|---|---|
| **MARCUS D. BERRY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 2:10 CV 124** |
| | ) | |
| **ARCELORMITTAL USA LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### OPINION and ORDER

## I.     BACKGROUND

Plaintiff Marcus D. Berry, an African-American male, began working for Inland Steel, the predecessor of defendant Arcelormittal USA, LLC, in 1972. (DE # 39-2 at 2, Pl. Dep. 8:6-25.) He was laid off for approximately four-and-a-half years in the 1980s, and worked elsewhere during that time, but returned to work for defendant in approximately 1988 as a bricklayer in the mason department. (*Id.* at 2-5, Pl. Dep. 8-11.)

James Norris, a white male and another one of defendant's employees, started working for defendant in the mason department in 1976. (DE # 39-3 at 3, Norris Dep. 12:6.) In 1999, Norris became manager of that department. (*Id.*, Norris Dep. 19:21-22.) Norris met plaintiff when Norris was first hired into the mason department and has known plaintiff for 36 years. (*Id.* at 4, Norris Dep. 19:18-20.) Plaintiff claims that he and Norris "had issues," but that Norris never made any racially derogatory comments towards him. (DE # 43-2 at 3, Pl. Dep. 17:21; DE # 39-2 at 8, Pl. Dep. 18:1-5.)

On September 30, 2008, plaintiff arrived at work between 7:15 and 7:30 in the morning and reported to the lunchroom. (DE # 39-2 at 11, Pl. Dep. 28.) Somehow, plaintiff bumped a table and some coffee spilled on another white co-worker, Steve Rarick. (*Id.*, Pl. Dep. 28:19-23.) According to plaintiff, Rarick jumped up and said, "Gosh look what you did." (*Id.* at 11-12, Pl. Dep. 28:25-29:1.) Plaintiff then said he was sorry and offered to get Rarick another cup. (*Id.* at 12, Pl. Dep. 29:2-4.) Rarick then threw coffee on plaintiff. (*Id.*, Pl. Dep. 29:11-12.) Plaintiff asked Rarick why he did that since he had already apologized, and then got a cup of coffee of his own and threw it on Rarick. (*Id.*, Pl. Dep. 29:12-15.) Then Rarick said, "Okay. Let's go to work," and everyone left the room to go get their work clothes on and go to work. (*Id.*, Pl. Dep. 29:17-19.)

After the employees did some work, they gathered in the lunchroom again to watch a safety film. (DE # 43-2 at 20-22, Pl. Dep. 38:22 - 39:8.) Once the film was over, the phone rang and an employee handed the phone to Joe Ramos, the union steward. (*Id.* at 21, Pl. Dep. 39:12-24.) Plaintiff later learned that it was Norris on the phone. (*Id.* at 39, Pl. Dep. 39:15-18; *id.* at 42, Pl. Dep. 42:10-20.) Plaintiff heard Ramos say "Yeah, uh-huh, uh-huh, yeah, okay," and then Ramos hung up the phone. (*Id.* at 39, Pl. Dep. 39:22-23.) Plaintiff testified that he was not loud at all while Ramos was on the phone with Norris. (*Id.* at 7, Pl. Dep. 42:18-20.)

Ramos told plaintiff that he wanted to "make sure you guys are going to get along again." (*Id.* at 5, Pl. Dep. 40:7-2.) At this point, plaintiff claims "the altercation started again," and plaintiff told Ramos "Well, I can get along with anybody as long as

they ain't throwing no coffee on me or trying to do me no bodily harm." (*Id.*, Pl. Dep. 40:9-12.) Plaintiff claims that "we started raising each other's voices. He said one thing, [Rarick] said something. I said something, and then Joe [Ramos] was trying to talk to us." (*Id.*, Pl. Dep. 40:12-15.) At one point, plaintiff told Rarick that he was "one crazy white boy" (*id.* at 7, Pl. Dep. 42:2), and Rarick told Ramos that plaintiff did not want to work around any white people (*id.* at 8, Pl. Dep. 43:5-6). Plaintiff protested that that was a lie, and then got up and decided that he was going to go home. (*Id.*, Pl. Dep. 43:9-13.) Plaintiff also asked Ramos who was on the phone, and when Ramos said "no one," plaintiff said "I'm tired of this," and got ready to go home. (*Id.* at 5, Pl. Dep. 40:15-21.) Plaintiff testified that he was angry during this exchange, that he "probably was talking boisterous" because he is "kind of deaf in one ear," and that he "might have" used profanities but he was not sure if he was using "that much." (*Id.* at 5-6, Pl. Dep. 40:22 - 41:12.)

Meanwhile, Norris had not been on site when the other workers arrived that morning during the seven o'clock hour. Norris testified at his deposition that he received a voicemail from Rarick at about 7:36 a.m. in which Rarick stated that when plaintiff came in, he was screaming and yelling at Rarick and was bumping the back of his chair and spilled coffee on him and another employee. (DE # 39-3 at 5-6, Norris Dep. 30:8-19, 31:19-25; DE # 43-3 at 11, Norris Dep. 112:15-20.) Norris also testified that he could hear plaintiff in the background screaming and yelling, "I'm not working for all you mother fuckers" and that every other word out of plaintiff's mouth was "eff this, eff

that." (DE # 39-3 at 5, 7, Norris Dep. 30:22-23, 35:6-21; DE # 43-3 at 18, Norris Dep.

47:18-25; *id.* at 11, Norris Dep. 112:15-20.) At around 8:00 or 8:30 a.m., Norris spoke to

John Weyhe, the team leader, to find out what was actually going on. (DE # 43-3 at 21,

Norris Dep. 43:11-16.) Then Norris spoke to Joe Ramos and asked him if he could take

care of the issue. (*Id.* at 18, Norris Dep. 47:10-15.) Around 9:00 a.m., Norris received a

voicemail from the lunch room area, in which he could hear plaintiff screaming. (DE

# 39-3 at 11-12, Norris Dep. 55:5-13, 56:5-7.) After what Norris heard on the phone, he

was not sure what he would be dealing with, so he called plant protection (security)

and proceeded to the job site. (DE # 39-3 at 15, Norris Dep. 60:6-14.)

When Norris arrived in the parking lot, he encountered plaintiff, Weyhe, and

Ramos. (DE # 39-2 at 14, Pl. Dep. 37:18-20; DE # 39-3 at 20, Norris Dep. 132:3-12.) At

some point, one member of plant protection also showed up. (DE # 43-2 at 9, Pl. Dep.

44:4-6; DE # 39-3 at 28, Norris Dep. 143:18-22.) Norris asked them what was going on.

(DE # 39-2 at 14, Pl. Dep. 37:18-20; DE # 39-3 at 20, Norris Dep. 132:3-12.) Plaintiff claims

that he responded that "[w]e had a little altercation" and that "we just resolved

everything here." (DE # 39-2 at 14, Pl. Dep. 37:21-24.) However, according to Norris,

plaintiff began "screaming and yelling and cussing" and was doing so "[l]oudly," not in

a "normal tone." (DE # 39-3 at 20-21, Norris Dep. 132:10-14, 133:12-15.) Norris testified

that plaintiff exhibited "[a]bnormal speech, screaming, yelling; facial expressions; any

kind of physical, I mean, movements, eyes; spitting, slurping speech." (*Id.* at 17, Norris

Dep. 62:8-10.) Norris also stated that plaintiff "was swearing at me, cussing all kinds of

words; hollering and screaming; speech again, slurp, spitting; all kinds of things were going on; cussing and swearing at me." (DE # 43-3 at 2-3, Norris Dep. 67:24 - 68:2.) According to Norris, plaintiff also said, "I don't have to answer a mother-fucking thing you mother fucker. I'm tired of this mother fucking place." (DE # 39-3 at 20, Norris Dep. 132:17-19.) Norris backed up a little bit because plaintiff was "coming at [him]." (DE # 39-3 at 21, Norris Dep. 133:10-11.) Norris believed that "[d]efinitely something was wrong with him." (*Id.* at 20, Norris Dep. 132:21.)

Norris told plaintiff that he was sending him to the clinic for a Fitness to Work Test ("FTWT"). (DE # 43-2 at 20, Pl. Dep. 38:1-5; *id.* at 9, Pl. Dep. 8-17.) Defendant's Personal Conduct Rule 2.C stated that "[a]ny employee suspected of being impaired by drugs may be required to submit to a drug screening test to determine their fitness to work." (DE # 39-2 at 27.) Norris filled out a company form to document his decision to send plaintiff to the FTWT; on the form, Norris checked the box next to "Conflict with employee(s)" as the reason for his decision, and checked the boxes next to "Speech rambling or tangential," "Speech fast or pressured," and "Yelling" as behavior he observed. (DE # 43-11 at 1.) Norris later gathered statements from plaintiff's co-workers about the incident and spoke to plaintiff's union steward. (DE # 43-3 at 12-14, Norris Dep. 114:1-25, 116:18-25, 120:4-22.)

Plaintiff went to the FTWT, and tested positive for cocaine. (DE # 43-2 at 10, Pl. Dep. 45:18-21.) Plaintiff testified at his deposition that he tested positive for cocaine because he had taken cocaine the weekend before. (*Id.*, Pl. Dep. 45:22-25.) Several days

later, on October 6, 2008, defendant terminated plaintiff's employment for violations of the company's Personal Rules of Conduct 2.B and 2.R. (DE # 39-2 at 25.) Rule 2.B prohibited being on company property impaired by drugs, and rule 2.R prohibited use of "profane, abusive, or threatening language/behavior towards supervisors or other employees or officials." (DE # 39-2 at 27, 30.) During his deposition, plaintiff was asked whether or not he should have been sent for the FTWT; plaintiff responded: "I'm not saying that I shouldn't have. I'm just saying that if [Rarick and I] had an altercation, the rule of thought is both parties should have went." (DE # 39-2 at 24, Pl. Dep. 60:14-19.)

On December 17, 2008, plaintiff and defendant entered into a "Last Chance Agreement," in which plaintiff admitted that he was properly discharged for violations of Rules 2.B and 2.R, and under which plaintiff was permitted to return to work so long as he agreed to forgo the use of drugs and would submit to random drug testing. (DE # 39-2 at 32-33.) Ultimately, plaintiff failed another drug test. (DE # 39-2 at 22, Pl. Dep. 57:11-20.) Norris testified that plaintiff was subject to termination as a result of the second failed drug test, but Norris recommended that the company let plaintiff retire so plaintiff could maintain his benefits. (DE # 39-3 at 25, Norris Dep. 139:2-24.) Plaintiff retired from employment with defendant on April 1, 2011, at which point his retirement benefits were fully vested. (DE # 39-2 at 23, Pl. Dep. 58:2-25.)

Plaintiff has now filed the present lawsuit alleging that defendant discriminated against him on the basis of race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1), when it ordered him to submit to the FTWT. (DE # 1.) Notably, plaintiff does not contest his termination in 2008, the reasons underlying defendant's decision to terminate him in 2008, or the circumstances surrounding his retirement in 2011. Rather, plaintiff focuses exclusively on Norris' decision to send plaintiff to the FTWT. Defendant has moved for summary judgment. (DE # 38.) Plaintiff filed a response (DE # 43), and defendant filed a reply (DE # 46). The motion is now ripe for ruling.

## II.    LEGAL STANDARD

FEDERAL RULE OF CIVIL PROCEDURE 56 requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). "[S]ummary judgment is appropriate–in fact, is mandated–where there are no disputed issues of material fact and the movant must prevail as a matter of law. In other words, the record must reveal that no reasonable jury could find for the non-moving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.,* 16 F.3d 832, 836 (7th Cir. 1994) (citations and quotation marks omitted).

The court's role in deciding a summary judgment motion is not to evaluate the truth of the matter, but instead to determine whether there is a genuine issue of triable

fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-50 (1986); *Doe v. R.R. Donnelley & Sons Co.,* 42 F.3d 439, 443 (7th Cir. 1994). On summary judgment a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder. *Payne v. Pauley,* 337 F.3d 767, 770 (7th Cir. 2003) (citing *Anderson,* 477 U.S. at 255). In viewing the facts presented on a motion for summary judgment, the court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. *Chmiel v. JC Penney Life Ins. Co.,* 158 F.3d 966, 968 (7th Cir. 1998); *Doe,* 42 F.3d at 443. Importantly, the court is "not required to draw *every* conceivable inference from the record [in favor of the non-movant]-only those inferences that are reasonable." *Bank Leumi Le-Israel, B.M., v. Lee*, 928 F.2d 232, 236 (7th Cir. 1991) (emphasis added).

## III.   DISCUSSION

As explained below, defendant's motion for summary judgment will be granted because: (A) plaintiff cannot demonstrate that he suffered an adverse employment action; and (B) plaintiff does not raise any issue of fact regarding whether Norris' decision to send plaintiff to the FTWT was motivated, even in part, by race.

### A.     Adverse Employment Action

Plaintiff pursues his Title VII claim under a "mixed-motives" theory. A "mixed-motives" case is "one in which 'an employee alleges that he suffered an adverse employment action because of both permissible and impermissible considerations.'" *Rapold v. Baxter Intern. Inc.,* — F.3d —, No. 11–2715, 2013 WL 336658, at *6 (7th Cir. Jan.

30, 2013) (quoting *Gross v. FBL Fin. Servs., Inc.,* 557 U.S. 167, 171 (2009)). Even in a "mixed-motives" case, Title VII requires a plaintiff to prove that he experienced an adverse employment action. *Hernandez v. HCH Miller Park Joint Venture,* 418 F.3d 732, 738 (7th Cir. 2005).

"An adverse employment action is 'a materially adverse change in the terms and conditions of employment [that is] more disruptive than a mere inconvenience or an alteration of job responsibilities.'" *Stockett v. Muncie Ind. Transit Sys.,* 221 F.3d 997, 1001 (7th Cir. 2000) (quoting *Crady v. Liberty Nat'l Bank & Trust Co.,* 993 F.2d 132, 136 (7th Cir. 1993)) (alteration in *Stockett*). The Seventh Circuit Court of Appeals has held that employer-ordered drug tests are considered adverse employment actions only if the test "is not performed in a routine fashion following the regular and legitimate practices of the employer, but [rather] is conducted in a manner that harasses or humiliates." *Stockett,* 221 F.3d at 1001-02. The Seventh Circuit expanded on this concept in *Hilt-Dyson v. City Of Chicago,* 282 F.3d 456, 466 (7th Cir. 2002), explaining that a claim relying on this type of adverse employment action essentially becomes analyzed as a harassment claim:

> Conditions of employment designed to harass and humiliate an employee because she is a member of one of Title VII's protected classes may constitute an adverse employment action. See Stockett v. Muncie Ind. Transit Sys., 221 F.3d 997, 1001 (7th Cir. 2000). However, the harassing conduct must be actionable harassment – severe or pervasive – before it will be considered an adverse employment action.

In assessing the severity of an employer's action, a court considers the impact of the harassment on the plaintiff's work environment from both a subjective and objective

viewpoint; the situation must be "'one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.'" *Gentry v. Export Packaging Co.,* 238 F.3d 842, 850 (7th Cir. 2001) (quoting *Faragher v. City of Boca Raton,* 524 U.S. 775, 787 (1998)). To determine whether an environment is objectively hostile or offensive, the court must consider all the circumstances, including frequency and severity of the conduct, whether it is humiliating or physically threatening, and whether it unreasonably interferes with an employee's work performance. *McPherson v. City of Waukegan,* 379 F.3d 430, 438 (7th Cir. 2004).

In this case, there is no evidence suggesting that plaintiff experienced severe or pervasive harassment when Norris ordered him to complete an FTWT. The one-time event can hardly be characterized as pervasive, and though a single event can be harassing if sufficiently severe, *Cerros v. Steel Techs., Inc.,* 288 F.3d 1040, 1047 (7th Cir. 2002), there is no evidence suggesting that the experience in this case was objectively hostile or abusive. Plaintiff was not physically threatened, and there is no evidence that the order unreasonably interfered with plaintiff's work performance (other than the obvious fact that he was later fired for testing positive for cocaine). There is no indication that the test itself was performing in a harassing or humiliating manner. *Keys v. Foamex, L.P.,* 264 Fed. App'x 507, 511 (7th Cir. 2008) (*Stockett* satisfied where no demonstration that the drug test itself made the plaintiff feel harassed or humiliated). Nor is there any evidence suggesting that the fact that plaintiff was sent for an FTWT was disclosed to the workplace at large, or that the event was publicized so as to

embarrass plaintiff. *Id.* (*Stockett* satisfied where vast majority of employee's co-workers were unaware that drug test was even ordered).

Despite all of this, plaintiff argues that Norris was not required to send plaintiff to a FTWT, suggesting that Norris' decision to do so was inappropriate (and, presumably, equivalent to harassment). In *Stockett,* the Seventh Circuit held that a "reasonable and legitimate request made pursuant to [the employer's] published Drug Policy does not constitute the type of adverse employment action that Title VII is designed to prevent." 221 F.3d at 1002; *see also Hilt-Dyson,* 282 F.3d at 464, 466 (fact that the employer's action served a legitimate purpose factored into court's conclusion that uniform inspection was not performed in harassing manner under *Stockett*); *Manson v. Gen. Motors Corp.,* 66 Fed. App'x 28, 35 (7th Cir. 2003) (because supervisor witnessed plaintiff cause disturbance and another supervisor had been told that plaintiff had boasted he was licensed to carry a gun, defendant had good reason to order psychological evaluation, so order was not adverse employment action).

In this case, a legitimate purpose – assuring the safety of defendant's employees – was served by the test that was ordered by Norris. The test was also ordered and performed in accordance with defendant's company policy regarding drug testing, which states that "[a]ny employee suspected of being impaired by drugs may be required to submit to a drug screening test to determine their fitness to work." (DE # 39-2 at 27.) This is a simple standard, and little (other than the employer's suspicion of impairment) is necessary. Under defendant's policy, a supervisor need not even

witness, first-hand, the individual to be tested before ordering the test. *Keys,* 264 Fed. App'x at 511 (if employee handbook does not require first-hand observation of the individual to be tested before ordering the test, a drug test ordered without first-hand observation still satisfies *Stockett).* Plaintiff admits that he was speaking loudly. Plaintiff admits that he might have been swearing. Plaintiff does not dispute that his loud speaking and cursing was reported to and later witnessed by Norris. Perhaps plaintiff disagrees with Norris' suspicion of drug use, but plaintiff does not dispute the existence of the very facts on which Norris based his suspicion.[1]

The real crux of plaintiff's argument, then, is not that he should not have been sent for a FTWT, but that Rarick should have *also* been sent. Plaintiff bases this argument on the fact that both he and Rarick were speaking in raised voices, and both he and Rarick were involved in their altercation. But Norris' decision was not based on what plaintiff claims happened or even what *actually* happened. Norris' decision was based on his own perception, which was that plaintiff was being loud and disruptive, but Rarick was not. Norris may have been completely wrong– perhaps Rarick was in fact just as loud and disruptive as plaintiff was. But that does not change the fact that Norris' perception was that only plaintiff was behaving erratically. Under defendant's drug testing policy, it is Norris' perception that matters. Norris testified that he perceived plaintiff to be loud and out of control, not Rarick. And "[n]othing requires the district court to disbelieve defendants' proffered evidence simply because [the

---

[1] Of course, in this case, it turns out that Norris' suspicion was correct.

plaintiff]—without proof—asserts it is false." *Carroll v. Lynch,* 698 F.3d 561, 565 (7th Cir. 2012) (rejecting plaintiff's argument that district court improperly credited opponent's testimony at summary judgment stage). Plaintiff "cannot rest on 'metaphysical doubt' that [his opponent] lied but must produce evidence so showing." *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)). However, plaintiff has not done so. The evidence in the record does not permit a reasonable inference that Norris actually *did* know or believe that Rarick was also behaving erratically, but nevertheless decided not to send Rarick for an FTWT, at least in part because Rarick was white.

Like the plaintiff in *Keys,* the plaintiff in this case seems to "rest[ ] . . . on the conclusory assertion that because the test was (allegedly) governed by a discriminatory motive it was necessarily harassing and humiliating." 264 Fed. App'x at 511. But, as explained by the court in *Keys,* this assumption ignores the fact that proof of an adverse employment action is an element of a Title VII plaintiff's case, and no presumption in plaintiff's favor applies. *Id.* The court cannot simply assume that Norris had race on his mind when he ordered plaintiff to submit to an FTWT, but not Rarick, because plaintiff is entitled to no such presumption. Rather, plaintiff must at least raise an issue of fact as to this issue, and he has not done so. Accordingly, the court cannot conclude that the decision to send plaintiff, but not Rarick, for an FTWT constituted harassment of plaintiff.

As explained in detail in the preceding paragraphs, plaintiff cannot demonstrate that Norris' decision to order plaintiff to submit to an FTWT "[was] conducted in a

manner that harasse[d] or humiliate[d]" him. *Stockett,* 221 F.3d at 1001–02. Without a demonstration that the decision amounted to harassment, Norris' order to submit to a drug test cannot constitute an adverse employment action. *Id.* Without an adverse employment action, plaintiff's Title VII claim fails. *See Hernandez.* 418 F.3d at 738. For this reason, defendant is entitled to summary judgment on plaintiff's Title VII claim.

## B. "Mixed Motive" Discrimination

Even assuming plaintiff were able to convince the court that Norris' decision to order plaintiff to submit to a drug test *did* constitute an adverse employment action, plaintiff's claim would still fail because, as explained below, plaintiff lacks sufficient evidence to warrant a reasonable inference of discriminatory intent on Norris' part.

As mentioned briefly above, plaintiff pursues his case under the "mixed motives" approach, only. (DE # 43-1, Pl.'s Resp. at 6.) Under the mixed motives approach to discrimination cases, a plaintiff may rely on either direct or circumstantial evidence to establish discriminatory intent. *See Gleason v. Mesirow Fin., Inc.,* 118 F.3d 1134, 1140 (7th Cir. 1997). Once the plaintiff successfully does so, the defendant employer may then avoid a finding of liability by proving that it would have made the same decision even if the plaintiff were not of a certain race. *Abioye v. Sundstrand Corp.,* 164 F.3d 364, 369 (7th Cir. 1998).

Plaintiff admits that he has no direct evidence of discrimination in this case (that is, no admission by the employer itself, *Fleishman v. Cont'l Cas. Co.,* 698 F.3d 598, 603 (7th Cir. 2012)). Nonetheless, plaintiff may rely upon circumstantial evidence to

establish discriminatory intent. *Gleason,* 118 F.3d at 1140. This is often referred to as the "convincing mosaic" approach. *Coleman v. Donahoe,* 667 F.3d 835, 860 (7th Cir. 2012). There are three types of circumstantial evidence, each of which can be sufficient by itself to support a plaintiff's case, or they can be used together. *Troupe v. May Dept. Stores Co.,* 20 F.3d 734, 736 (7th Cir. 1994). The first type consists of "bits and pieces" of evidence "from which an inference of discriminatory intent might be drawn," such as evidence of suspicious timing, ambiguous statements, and behavior toward or comments directed at other employees in the protected group. *Troupe v. May Dept. Stores Co.,* 20 F.3d 734, 736 (7th Cir. 1994). Second is evidence that employees similarly situated to the plaintiff (other than in terms of race) received systematically better treatment. *Coleman,* 667 F.3d at 860. Finally, a plaintiff may offer evidence that the employer's stated reason for the adverse employment action is unworthy of belief, a mere pretext for discrimination. *Id.* In this case, plaintiff claims to rely on the first type of circumstantial evidence ("bits and pieces" from which an inference of discriminatory intent might be drawn), but he appears to also employ the third type (evidence showing pretext), so for his benefit the court will examine his arguments through that lens as well.[2]

---

[2] The third type of circumstantial evidence – that which shows pretext – is similar to a required element of the commonly-used indirect method of proof first set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), so analyses of the two often overlap. *Coleman,* 667 F.3d at 860 n.8. For this reason, the court has considered case law addressing the concept of "pretext" whether it came from a case like this one, which involves circumstantial evidence under the direct "mixed motives" method of proof, or a case like *McDonnell Douglas,* which involved the indirect method of proof.

Plaintiff's main proposed piece of circumstantial evidence is his assertion that Norris has changed his story about the reasons for sending plaintiff for an FTWT. According to plaintiff's logic, the resulting inconsistency demonstrates that defendant's stated reason for sending plaintiff for an FTWT was a pretextual cover for discrimination. In support of this argument, plaintiff points to defendant's answers to plaintiff's first set of interrogatories, to which Norris was not a signatory. In those answers, defendant stated that plaintiff was sent for an FTWT because he "acted erratically and irrationally, yelling, out of control, while using profane and abusive language towards co-workers." (DE # 43-6 at 1.) In its response to plaintiff's request for admissions, a document to which Norris also was not a signatory, defendant further stated that "Berry was sent for a fitness to work test . . . due to his disruptive conduct toward Mr. Rarick." (DE # 43-5 at 2.) Plaintiff further points out that on the FTWT order form, Norris checked "Conflict with employees" as the reason for the order. (DE # 43-3 at 5, 76:6-10.) Norris testified at his deposition that the employees he was referring to were Rarick and Lenny Musier.  (DE # 43-3 at 5, Norris Dep. 76:11-25.)

Later, in its amended answers to plaintiff's interrogatories, a document to which Norris was a signatory, defendant states that plaintiff was sent for an FTWT because he "was yelling and screaming, and was using profanities towards co-workers." (DE # 43-6 at 8.) The next interrogatory asked what objective evidence Norris personally witnessed in deciding to send plaintiff for an FTWT. In answer to this question, defendant states that after Norris went to where plaintiff was located, he "personally observed Plaintiff

as he continued to yell, scream and use profanities toward co-workers." (DE # 43-6 at

8.) Norris also testified in his deposition that he sent plaintiff for an FTWT because of

"[t]he altercation that him and I had out in the parking lot." (DE # 43-3 at 2, Norris Dep.

67:14-16.) Norris further elaborated that "[plaintiff] was swearing at me, cussing all

kinds of words; hollering and screaming; speech again, slurp, spitting; all kinds of

things were going on; cussing and swearing at me." (*Id.* at 3, 68:24-68:2.) Plaintiff argues

that, "out of the blue," Norris provided this "new rationale" for ordering the FTWT –

specifically, the fact that Norris had personally observed plaintiff yelling and using

profanities in the parking lot – demonstrating an inconsistency in Norris' explanations

and proving that discriminatory intent must have been lurking beneath the surface. (DE

# 43-1, Pl.'s Resp. 10.)

"Shifting and inconsistent explanations can provide a basis for a finding of

pretext." *Schuster v. Lucent Techs., Inc.,* 327 F.3d 569, 577-78 (7th Cir. 2003). "But the

explanations must actually be shifting and inconsistent to permit an inference of

mendacity." *Id.* When an overall account is "substantially consistent," the explanations

cannot be said to be shifting and inconsistent to the extent that they permit a finding of

pretext. *Id.*; *Rand v. CF Indus.,* 42 F.3d 1139, 1146 (7th Cir. 1994) (noting that summary

judgment in favor of the employer is proper if the proffered explanations are consistent

"in substance if not word choice"). Further, an inference of discriminatory animus is not

justified when a decision-maker provides an "additional, not necessarily inconsistent

reason for the employment decision, rather than an abrupt change in explanation."
*Schuster,* 327 F.3d at 579.

The Seventh Circuit provided an example of inconsistent statements that would permit an inference of discrimination in *Stalter v. Wal-Mart Stores, Inc.,* 195 F.3d 285, 291 (7th Cir. 1999). In that case, an employee was fired, purportedly for taking a handful of taco chips from an open bag in the lunchroom. During a state administrative proceeding, the employer claimed that the owner of the taco chips had complained to the company about the incident. Later the employer admitted that the chip owner never complained, but argued that under the company's policy, the viewpoint of the alleged victim was irrelevant. *Id.* at 291. The court found this inconsistency persuasive, and evidence of pretext. *Id.*

In contrast with *Stalter* are cases like *Schuster,* 327 F.3d at 578-79. In *Schuster,* the employer initially claimed that, in deciding whether to include plaintiff or a second employee in a reduction-in-force, it relied on talent profiles prepared for both employees, which gave the second employee a slight advantage in terms of technical knowledge. Later, however, the employer stated that it was concerned about the plaintiff's performance and management style. *Schuster,* 327 F.3d at 578. The Seventh Circuit rejected the plaintiff's contention that the inconsistency raised an issue of fact as to pretext, holding: "The alleged last-minute switch from relying on [plaintiff's] scores on his talent profile to relying on [plaintiff's] specific work-performance deficiencies as

a rationale for his termination is an additional, not necessarily inconsistent reason for the employment decision, rather than an abrupt change in explanation." *Id.* at 579.

In this case, the court begins with the concept that discriminatory animus can only be inferred "when *decisionmakers* make false or inconsistent statements about the circumstances of a particular employment decision." *Krchnavy v. Limagrain Genetics Corp.,* 294 F.3d 871, 876-77 (7th Cir. 2002) (emphasis in original). Accordingly, only Norris' statements about the circumstances are relevant to this discussion, and the court confines its analysis to those statements. With that in mind, Norris has consistently claimed that plaintiff behaved erratically, including yelling and using profane language, both towards co-workers and in the parking lot when Norris himself was present. The two examples of plaintiff's out-of-control behavior (first with Rarick and his co-workers and later in front of Norris) are not inconsistent with each other (quite the opposite, in fact), and Norris never withdrew his assertion of one premise in order to shift his story to the other. The court cannot conclude that Norris' statements were the type of "blatant inconsistencies or negative admissions" from which pretext could be inferred. *Perfetti v. First Nat'l Bank of Chi.,* 950 F.2d 449, 456 (7th Cir. 1991). Rather, Norris' statement that plaintiff was sent for an FTWT due to his behavior in front of Norris in the parking lot is an "additional, not necessarily inconsistent reason for the employment decision, rather than an abrupt change in explanation." *Schuster,* 327 F.3d at 579.

In any event, to the extent that any reasonable juror could conclude that Norris made "inconsistent" statements about the reasons for ordering the FTWT, Norris'

19

assertions are not so "[s]hifting and inconsistent" that a reasonable juror hearing them could infer, as a result, that race was somehow a factor in Norris' decision to send plaintiff to an FTWT. *Schuster,* 327 F.3d at 577-78. In other words, Norris' purported inconsistencies do not create an issue of fact regarding whether defendant sent plaintiff for an FTWT based, even in part, on his race.

Plaintiff also argues that Norris made inconsistent statements regarding whether he conducted an "investigation" of the matter. An examination of Norris' deposition testimony reveals that Norris was repeatedly asked whether he conducted an "investigation" into the dispute between plaintiff and Rarick, and variously answered negatively and affirmatively. (*See* DE # 43-3 at 9-10, Norris Dep. 108:21 - 109:15; *id.* at 14, Norris Dep. 120:4-22.) However, as plaintiff admits, Norris ultimately outlined how he gathered statements from plaintiff's co-workers about the incident and spoke to plaintiff's union steward. (*See, e.g., id.* at 12-14, Norris Dep. 114:1-25, 116:18-25, 120:4-22.) The court does not see how Norris' lack of consistency regarding whether he considered these steps an "investigation" or not permits an inference of pretext or of racial animus. Further, there is no logical link between the alleged inconsistency (whether or not Norris considered his actions an "investigation") and the alleged discriminatory act (sending plaintiff for an FTWT). *See Schuster,* 327 F.3d at 579 (employer's alleged "changing story" as to who actually participated in decision to terminate plaintiff was insufficient to raise a question as to whether the reason given for the termination was pretextual).

Plaintiff's other "bits and pieces" of circumstantial evidence are similarly unpersuasive. For example, plaintiff alleges that Norris operated in a "climate of bias." Specifically, plaintiff points to facets of Norris' history, such as the fact that he didn't go to high school with black people and never worked with black people before working for defendant's company. Plaintiff also points to the fact that Norris has been the brick mason manager since 1999, but there are only about 5 black masons out of 100 at the plant where plaintiff works. Plaintiff argues that Norris has never assigned an African-American to become a team leader, nor are there any African-Americans on the interview team for the hiring of brick masons. Finally, plaintiff points to the fact that Norris does not know whether the company's nondiscrimination policy is located on the company's HR website.

The Seventh Circuit rejected a similar argument in *Pafford v. Herman,* 148 F.3d 658, 666 (7th Cir. 1998), a case containing more severe indications of racial animus. In that case, after an allegedly racist supervisor was hired, no minority employees were hired nor promoted, and all of the current minority employees were terminated or resigned. Further, the supervisor told someone in the office she lived in a particular area to be "away from the black people." *Id.* The plaintiff presented additional circumstantial evidence, suggesting that the supervisor was averse to food brought into the office by minorities and served cake at a company function in a rude manner to minorities, while being friendly to whites. *Id.* According to the Seventh Circuit, even though "some of the foregoing evidence suggests discriminatory animus," the totality

of the evidence was not sufficient to create an inference of discrimination under the "convincing mosaic" standard. *Id.*

The circumstantial evidence presented by plaintiff in this case is even less convincing. In this case, there is no indication that Norris purposely avoided blacks in his personal life, and there is no evidence that after he became a supervisor, blacks left the department and no further minorities were hired. Nor is there any evidence that Norris possessed a distaste for or distrust of minorities. Even if such evidence were present, under *Pafford,* it would not be enough. Further, even if Norris existed in a "climate of bias" like plaintiff claims, plaintiff has not provided *any* evidence allowing for an inference that Norris' exposure to such a climate is linked in any way to the adverse employment action plaintiff alleges he suffered. *Gorence v. Eagle Food Ctrs., Inc.,* 242 F.3d 759, 762 (7th Cir. 2001) ("[B]igotry, per se, is not actionable. . . . there must be a real link between the bigotry and an adverse employment action.").

It is important to remember that plaintiff relies on the "convincing mosaic" method of proof in this case, under which a plaintiff tries to present a collection of evidence, none conclusive in itself but together composing a convincing mosaic of discrimination. Accordingly, the court must consider all of the evidence offered by plaintiff in this case – Norris' "inconsistent" statements, Norris' personal history involving minorities, Norris' professional history involving minorities, the demographic make-up of Norris' department, and so on – in the aggregate. However, even considering all of this evidence together, the court cannot conclude that plaintiff

has raised an inference of discrimination. Norris' purportedly "inconsistent" statements are probative of almost nothing, even when combined with the fact that Norris' personal history included little exposure to blacks and few blacks worked for Norris' department. Under the mixed motives approach, it is plaintiff's burden to establish that a factual issue exists regarding discriminatory intent in order to survive summary judgment. *See Gleason,* 118 F.3d at 1140. Because plaintiff has not done so, summary judgment for defendant is appropriate.

## IV. CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment (DE # 38) is **GRANTED.** There being no claims remaining against any defendant, the Clerk is hereby directed to **ENTER FINAL JUDGMENT** in this case stating:

> Judgment is entered in favor of defendant Arcelormittal USA LLC; and against plaintiff Marcus D. Berry, who shall take nothing by way of his complaint.

**SO ORDERED.**

Date: April 10, 2013

         s/ James T. Moody_____
JUDGE JAMES T. MOODY
UNITED STATES DISTRICT COURT